241 S.W.2d 100 (1951)
CLARK et al.
v.
CITY OF SPRINGFIELD.
No. 6975.
Springfield Court of Appeals. Missouri.
May 8, 1951.
*102 Howard C. Potter, Meredith B. Turner, Springfield, Ray E. Watson of Watson, Richart & Titus, Joplin, for appellant.
Kirby W. Patterson, Springfield, for respondent.
VANDEVENTER, Presiding Judge.
This is a suit for damages alleged to have been sustained by plaintiffs (respondents) by reason of a nuisance maintained by defendant-appellant. The nuisance was alleged to be caused by the overflow of surface and sewage waters onto and across plaintiffs' land. From a judgment in favor of plaintiffs, defendant appealed.
The petition alleges that plaintiffs, since April 29, 1946, have owned lots 23 and 24 in the Third Addition to Fairfield Acres and that said lots have been improved by the erection of a dwelling house and other buildings thereon; that plaintiffs, together with their family, live in said dwelling house and were deprived of the comfortable use and enjoyment of their home by reason of a nuisance maintained by defendant. That the defendant maintained near plaintiffs' premises a sanitary sewer which drained southwesterly, and down in the direction of plaintiffs' home, to a point about one block east thereof where it turns to the left, proceeding south on West Avenue to where a pump is installed for the purpose of raising the sewage so that it will flow, by force of gravity, to the Southwest Disposal Plant; that at the turn in said sewer there is a manhole and also a short distance northeast and up the sanitary sewer line from that place another one, and that the covers of each contain some 30 holes about one-half inch in diameter; that on numerous occasions after ordinary rain falls, as well as after heavy storms, the valume of sewage carried in the sanitary main has been augmented by great volumes of surface waters flowing through drains maintained by defendant into the sewer main; that the pressure of the accumulated water forced the manhole cover off at the low point and bend in the line, causing the sewage, composed of filth and human excrement to boil and spout in the air, and from there flowing along the ground in a southwesterly direction onto plaintiffs' property. That at times when the pressure of the sewage water is not sufficient to force the cover from said manhole, the raw sewage would spurt up through the holes in the cover and flow upon plaintiffs' premises; that the defendant further *103 added to and augmented said nuisance by maintaining a drain for surface water consisting of a metal pipe approximately one yard in diameter, which collects water that flows along the gutters and drains in that section of the city and facilitates its passage to a point about 300 feet northeast of the turn in the sanitary sewer and there discharges in great volume said surface water onto the neighboring land, from which it flows by force of gravity down upon plaintiffs' premises; that on numerous occasions, this sewage and surface water, so flowing, surrounded plaintiffs' dwelling house on all sides, carrying away large quantities of plaintiffs' soil and upon recession of the water, leaving deposits of raw human excrement, filth, etc., which caused a sickening smell and attracted large swarms of flies to such an, extent that plaintiffs were compelled to close their windows in the hottest weather; that plaintiffs dug a well in 1947, to supply water for their home, which at first produced an abundance of clear potable water but after the flooding aforesaid, it was so contaminated and emitted such foul and noxious odors as to become completely unfit for drinking purposes; that it was permanently polluted by the overflow of sewage and surface waters and its usefulness completely destroyed; that after several attempts and considerable expense plaintiffs succeeded in getting an adequate well but in the meantime were compelled and did haul water for household purposes at great personal inconvenience. They prayed judgment for $5,000.
Defendant's answer admitted the maintenance of an underground sanitary sewer running in the directions alleged in the petition, the location of the manholes and that the iron covers for them were perforated with small holes and denied all other allegations of said petition. Further answering, defendant asserted that plaintiffs' property was located in the natural passage point for drainage water from a large portion of the neighboring properties, that this condition had existed for many years and that it had during that time been overrun and flooded by surface water in periods of wet weather; that plaintiffs disregarded these facts when they purchased the property and erected the improvements thereon and that they had attempted to erect barriers and fills against surface water invasion, but such attempts only succeeded in stagnating the flow of such waters, so that miscellaneous filth and debris gathered by such surface waters from the area drained is partially, if not wholly collected or deposited near their premises; that if the conditions described in plaintiffs' petition are true, it was brought about by their own lack of careful and prudent planning in the erection or construction of improvements, barriers and fills.
It was then alleged that the sanitary sewer was constructed in 1936 and is a portion of the permanent sewage system of defendant, had been used continuously since that time and long prior to the acquisition of property by plaintiffs and that their claim is barred by the statute of limitations; that the surface water drain mentioned in plaintiffs' petition is a permanent structure, had been in its present location since 1938, long before plaintiffs' occupation of their premises, and for more than ten years before plaintiffs' occupation or ownership of the property and the filing of the petition and therefore defendant has a right, a prescriptive right, to maintain such drain and that plaintiffs' action for damages on that score is barred by the statute of limitations.
Plaintiffs' reply admitted the erection of barriers and fills in an attempt to prevent the inundation of their premises by water but denied that their efforts had stagnated the flow of such waters in such manner as to cause it to be collected on their premises in any greater degree than otherwise would have been and deny that they are barred by the statute of limitations. It is further alleged that the nuisance maintained by the defendant is abatable.
The case was tried to a jury which returned a verdict for plaintiffs in the sum of $3020, from which verdict the defendant appealed.
Appellant contends that the verdict of the jury was against the weight of the evidence, *104 in other words, that the verdict was not supported by substantial evidence.
It is the province of the jury to pass upon the credibility of witnesses and if the verdict is supported by substantial evidence, this court cannot disturb it, although such evidence is contradicted, and though we, had we been triers of the facts, might have arrived at a different conclusion. Steckdaub v. Sparks, Mo.Sup., 231 S.W.2d 160; Morris v. Freyer, Mo.App., 151 S.W. 2d 515; Spriggs v. Calument Cab Co., Mo. App., 161 S.W.2d 741; Conner v. Neiswender, 360 Mo. 1074, 232 S.W.2d 469; Nance v. Atchison, T. & S. F. Ry. Co., 360 Mo. 980, 232 S.W.2d 547.
In deciding whether there is substantial evidence to support the verdict of the jury, the reviewing court must take plaintiff's evidence as true, must give plaintiff the benefit of all favorable inferences arising therefrom, as well as from defendant's evidence, and must disregard all of defendant's evidence that is in conflict with plaintiff's or fails to strengthen plaintiff's case. Burkland v. Starry, Mo.Sup., 234 S. W. 2d 608; Sollenberger v. Kansas City Public Serv. Co., 356 Mo. 454, 202 S.W.2d 25; Persten v. Chesney, Mo.App., 212 S.W. 2d 469; Smith v. St. Louis-San F. Ry. Co., Mo.App., 214 S.W.2d 443; Silvey v. Herndon, Mo.App., 234 S.W.2d 335.
In accordance with this rule, we will review plaintiffs' evidence. Briefly stated, it showed that they were the owners of lots 23 and 24 of Third Addition to Fairfield Acres, which was located on the west side of and about one block from the city limits. On the east of their property was a watershed which flowed generally in a southwesterly direction toward their lots; northeast of their premises was a sanitary sewer main running in a southwesterly direction to West Avenue, a street running north and south, one block east of their home, and then the route of the sanitary sewer turns south, (this elbow having a tendency to slow down the flow and build up the pressure) until it came to a pumping station maintained by the defendant, which lifted the sewage (24 feet) over an elevation partially caused by the Frisco Railroad tracks and partially by the natural contour of the land. After the sewage was raised at this pumping station, it drained by gravity south on West Avenue and eventually into the southwest disposal plant. At the turn in the sanitary sewage main, where it arrived at West Avenue and ran south, was a manhole and northeast of there along the course of the sanitary main was another, some 200 feet from the first. Defendant had constructed a storm sewer beginning some distance east of the sanitary sewer, proceeding west to that, sewer and then south one block and thence one-half block west where it ended and permitted this surface water to pour out in an open ditch from which it later spread out upon the adjoining land. This storm sewer was of vitrified clay and was 36 inches in diameter part of its length and was buried in the ground. At Forest Street which was one-half block farther west from the end of the storm sewer, the outlet under the street for this water was 15 inches in diameter. It was at times insufficient to carry the water away from the storm sewer and backed up and covered the surrounding terrain. Plaintiffs built a concrete wall along the north and east sides of their lots which was adequate until defendant opened up the ditches and "put in bigger pipes on the frontage through the street and then sent all the water down on me and then it run over my wall." The saturated ground caused the foundation of his house to "wash out" and his floors became unlevel. At the point where it was turned into the open ditch and thence onto plaintiffs' land, it crossed and followed the route of the sanitary sewer and saturated the ground, and by infiltration entered the sanitary sewer through imperfect joints and by flooding over the manholes, until the pressure was so great that when it arrived at the two manholes mentioned, it would push the iron covers (weighing 130 lbs.) from them and discharge raw sewage into the surface water which flowed down and flooded plaintiffs' premises. It took only an ordinary rain to produce this result. The evidence further showed that when the waters had receded and the land was *105 drying out, it emitted noxious odors, caused flies to accumulate, killed the vegetation and made the occupancy of plaintiffs' residence practically unbearable. The flood waters percolated into plaintiffs' well, which cost $350 to drill, which previously had contained potable water and completely ruined it for culinary purposes. It became so contaminated with sewage that the water from it could not be used to mix with plaster in repairing the house. Two other wells were drilled and contaminated before they finally got one (the fourth) the water of which they could use, but it was not in sufficient quantity to supply all the household needs. The first one had been entirely sufficient.
Photographs were introduced in evidence showing plaintiffs' residence and other buildings inundated with water and the evidence showed that on numerous occasions, the covers would be completely forced off the manholes and the filthy water from the sanitary sewer would spurt up, as high as two feet, disgorging upon the adjoining terrain, and eventually onto plaintiffs' property, the sewer's filth.
There was a strong inference that the extension of the storm sewer would have diminished the amount of surface waters permitted to percolate into the sanitary sewer and would have carried it in such way as to materially relieve plaintiffs' inundation problem. Plaintiff and his neighbor offered defendant a "water-way" through their property to extend the storm sewer.
There was also evidence that the pump on West Avenue, just north of the Frisco tracks, which was installed to raise sewage in the sanitary sewer so it would proceed on south by gravitation, while large enough at the time of its installation (1934) to handle the normal amount of sewage for the coming 15 or 20 years, was not sufficient at the time of the trial, See Boyer v. City of Tacoma, 156 Wash. 518, 286 P. 659, 70 A.L.R. 1342, and Anno. 1347, but that its capacity could have been increased so as to materially increase the flow of sewage across the elevation and to some extent, at least, relieve the plaintiffs' property from inundation.
First, a few general principles of law.
Surface water is regarded as a common enemy and a person may guard against it or divert it from his premises. Abbott v. The K. C., St. J. & C. B. Ry. Co., 83 Mo. 271, loc. cit. 283; White v. Wabash Railroad Co., 240 Mo.App. 344, 207 S.W.2d 505; Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118; Casanover v. Villanova Realty Co., Mo.App., 209 S.W.2d 556; City of Hardin v. Norborne, 360 Mo. 1112, 232 S.W.2d 921, loc. cit. 926; Polich v. Hermann, Mo.App., 219 S.W.2d 849. Young v. Moore, Mo.App., 236 S.W.2d 740.
Of course the rights given under the "common enemy" doctrine, must be exercised within reasonable limits and not recklessly, so as not to needlessly injure the servient tenements. Cox v. Hannibal & St. J. R. Co., 174 Mo. 588, 74 S.W. 854, loc. cit. 859; Hosher v. Kansas City, St. J. & C. B. R. R. Co., 60 Mo. 329; Abbott v. Kansas City, St. J. Council Bluffs R. R. Co., 83 Mo. 271; Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118; Casanover v. Villanova Realty Co., Mo.App., 209 S.W.2d 556; Polich v. Hermann, Mo.App., 219 S.W.2d 849; Place v. Union Twp., Mo. App., 66 S.W.2d 584; Atchison, Topeka & Santa Fe R. R. Co. v. Taylor, D. C., 87 F.Supp. 313.
But one should not artificially impound or collect surface water and cast it in increased and destructive quantities upon the servient estate to its damage. Kiger v. Sanko, Mo.App., 1 S.W.2d 218; Cannon v. City of St. Joseph, 67 Mo.App. 367; Lewis v. City of Springfield, 142 Mo. App. 84, 125 S.W. 824; Bodam v. City of New Hampton, Mo.App., 290 S.W. 621; Tucker v. Hagan, Mo.App., 300 S.W. 301.
And this rule applies to a municipal corporation. Rychlicke v. St. Louis, 98 Mo. 497, 11 S.W. 1001, 4 L.R.A. 594. Lucas v. City of Louisiana, Mo.App., 173 S.W.2d 629.
Discharge of sewage upon a person's premises may constitute a nuisance. *106 McQuillin on Municipal Corporations (3rd Ed.) Vol. 18, Sec. 53.129. Carpenter v. City of Versailles, Mo.App., 65 S.W.2d 957; King v. City of Kansas City, 58 Kan. 334, 338, 49 P. 88; Dohany v. City of Birmingham, 301 Mich. 30, 2 N.W.2d 907.
The discharge of surface water upon another's premises may be actionable. Paddock v. Somes, 102 Mo. 226, 14 S.W. 746, 749, 10 L.R.A. 254; Zook v. City of Louisiana, Mo.App., 12 S.W.2d 518. McQuillin's Municipal Corporations Vol. 11, Sec. 31.24 and 31.27.
We quote from Paddock v. Somes, supra: "`An actionable nuisance may, therefore, be said to be anything wrongfully done or permitted, which injures or annoys another in the enjoyment of his legal rights.' Cooley, Torts, (2d Ed.) 670. `The right of one to be secure against the undermining of his buildings by water, or the destruction of his crops, or the poisoning of the air by the stealthy attacks of an unseen element, is as complete as his right to be protected against open personal assaults or the more demonstrative, but not more destructive, trespasses of animals.' Id. 675. And of course it is an actionable injury and nuisance for one to collect surface waters and cast them in a body upon a neighboring proprietor; and the same rule holds in this regard, both as to individuals and to municipal corporations. The latter, though not obliged to construct sewers or drains to protect adjoining owners against the flow of surface water from public ways, yet, if they do construct drains, and thus carry water and cast water upon the adjacent lands, are as much responsible as though they had invaded such lands by sending their servants thereon. * * * Sufficient has been said to condemn, as erroneous, all of the instructions, whether given by the court in behalf of the defendant or of its own motion, which gave recognition to the defendant of a right to collect surface water into artificial channels, and then cast it upon the land of his neighbor. There is no law for any such assertion; and it makes no difference, in point of principle, that some of the water thus collected in such channels consisted of spring water, or drainage or sewerage water, since the liability consists in collecting water, from whatever source collected, and then casting it upon the lands of another."
See also; Bollinger v. Mungle, Mo.App., 175 S.W.2d 912; Martin v. City of St. Joseph, 136 Mo.App. 316, 117 S.W. 94; Beckley v. Skroh, 19 Mo.App. 75.
As was said in Crutcher v. Taystee Bread Co., Mo.Sup., 174 S.W.2d 801, 805: "There is no exact rule or formula by which the existence of a nuisance or the non-existence of a nuisance may be determined. `Necessarily each case must stand upon its own special circumstances, and no definite rule can be given that is applicable in all cases, but when an appreciable interference with the ordinary enjoyment of property, physically, is clearly made out as the result of a nuisance, a court of equity will never refuse to interfere, * * *.'"
The evidence shows that the surface water partly by ditches along the street came down from the north and east part of the watershed to the corner of Nichols and Park Avenue, where it was shunted into a vitrified tile clay conduit three feet in diameter, taken from there west some 400 feet, then south approximately 700 feet, then west almost 200 feet, where it was turned out into an open ditch and allowed to follow its own course, which was generally along the line of the sanitary sewer. This enabled it to infiltrate into the sanitary sewer through the joints between the three foot lengths of pipe, and which one of defendant's witnesses testified, might have been caused by defective connections at the joints or by shifting of the pipe underneath the ground, and the effects of which would be to increase the pressure and also the volume of water carried by the sanitary sewer. The jury was justified in finding by the evidence that this water was carried in greater volume this long distance and disgorged into the ditch without any opportunity to be absorbed into the ground and without any evaporation, thereby increasing the quantity reaching the west end of the storm sewer. One witness for defendant said that if 10,000 gallons went in the east end of the storm sewer, 10,000 *107 gallons would come out of the west end, but if the water were spread over the ground in the process of natural drainage, there would be some absorption. It would be a matter of common knowledge to reasonable men that if the same amount of water were distributed over the ground and not thrown into a vitrified tile pipe, (from which the evidence showed there would be no escape) that there would be a great deal of water lost by absorption or evaporation. The surface water that did not infiltrate into the sanitary sewer ran across it as West Avenue a short distance north of Chestnut, covered the manhole from which boiled the contents of the sanitary sewer, and this mixture, proceeding in no definite channel, spread out upon the terrain and especially upon the two lots owned by plaintiffs.
The inundation of plaintiffs' property with this mixture of surface and sewer water, the scum of filth left after it had receded, the noxious odors therefrom, the destruction to their vegetation, the flies that were attracted to the premises by reason of the filthy deposits, the pollution of their wells, the damage to the foundation to their house and the washing away of their surface soil certainly was an interference with the peaceful enjoyment of their premises. That they had suffered damages therefrom was clearly shown by the evidence and the trial court was correct when it overruled defendant's motion for a directed verdict.
Appellant objects to the following instruction: "1. The Court instructs the jury that the plaintiffs in this case had the right under the law to the comfortable use and enjoyment of their home and, if you find and believe from the evidence that defendant city during the period from April 29, 1946, to December 9, 1949, maintained a storm sewer which collected the surface water from surrounding territory and cast it in a body upon property neighboring that of plaintiffs in such a manner as to cause it to flow from force of gravity down upon plaintiffs' property, or if you find that defendant city during the said period maintained the sanitary sewer mentioned in the evidence in such a manner as to permit the escape of raw sewage therefrom so as to flow from force of gravity down upon plaintiffs' property, or if you find that the defendant city, during said period, has caused both sewage and surface water to be discharged in the manner described on neighboring lands so as to flow down upon plaintiffs' property, and if you further find that plaintiffs have been damaged thereby, then your verdict must be for the plaintiffs and against the defendant."
The first objection is to the abstract statement that the plaintiffs were entitled to the comfortable use and enjoyment of their home. While that is an abstract statement, it is the law, and a similar instruction was approved in the case of McCracken v. Swift & Co., 212 Mo.App. 558, 250 S.W. 953, affirmed, Mo. Sup., 265 S.W. 91. Defendant could not have been harmed by the court so instructing.
This instruction is further attacked upon the theory that it contains disjunctive statements of "three alternate predicates of liability"; that part of the jury might have thought the surface water created the damage, another part might have thought it was caused by sewer water and still another part might have thought it was caused by a combination of both. Plaintiffs were entitled to recover if the damage was caused by either of these alternatives and we cannot see how defendant was injured, even if part of the jury thought sewage water caused it, part of the jury thought surface water caused it and another part thought a combination of the two caused it. From their verdict they apparently thought a nuisance had been maintained and damage to the plaintiffs had resulted.
Further objection is made to Instruction No. 1 because it did not state that the acts complained of constituted a nuisance. It was the jury's duty to pass upon the facts. Whether or not the facts they found constituted a nuisance was a question of law, Pearson v. Kansas City, 331 Mo. 885, 55 S.W.2d 485; Smiths v. McConathy, 11 Mo. 517, and it was entirely *108 without the jury's province to pass upon that question. Whether a nuisance existed depends upon the facts pleaded, proved and instructed upon and not upon a conclusion born from the use of the word. Martin v. City of St. Joseph, 136 Mo.App. 316, 117 S.W. 94.
Also: "It is immaterial whether the contents of the sewer are discharged directly on the property of an individual or at such a point that the sewage and other refuse taken along with it must necessarily be carried there by a conduit or gravitation." (38 Am.Jur. Municipal Corporations, Sec. 640) Harbison v. City of Hillsboro, 103 Or. 257, 204 P. 613.
Plaintiffs' second instruction told the jury if they found in favor of plaintiffs, that in determining the damages, they might consider, (if they found them to exist,) (1) the inconvenience due to the flooding of their property, (2) the odors and stenches arising because of the flooding of the premises with sewer and surface water and the stagnation of same, (3) the physical damage by washing away the soil, (4) the pollution of plaintiffs' well caused by such water, and (5) the inconvenience caused by the pollution of the wells by plaintiffs' being compelled to procure potable water from other sources.
We think each of these was an element of plaintiffs' damage and that the jury had the right to consider them in arriving at the amount thereof, if they further found defendant was responsible.
Defendant objects to its offered Instruction 6A, but which was modified by the court by striking out the word "unneces. sarily" between the words "not" and "collect" and adding the words "increased volume or quantity". As revised, Instruction 6A was as follows: "The court instructs the jury that surface water is a common enemy, and that if you find and believe from the evidence that defendant city in providing for the drainage of surface water, utilized the regular and natural drainways provided by nature therefor, and if you further find and believe from the evidence that defendant city, in utilizing such natural drainways, did not collect surface water and discharge it in increased volume or quantity upon and across plaintiff's property to plaintiff's damage, then you cannot assess any damages against defendant City with respect to such discharged surface water flowing across or coming to rest on plaintiff's premises." (Italics ours.)
If this instruction had not been corrected by the court, it would have given the jury a roving commission to determine, as they saw fit, the meaning of the word "unnecessarily" and apply it to the facts. The defendant's duty would have been left to the jury's imagination without any guidance as to the law by the court. It would have been confusing, there would have been no limit as to what the jury could have found regarding it. This instruction as given, was certainly as favorable to defendant as could be demanded.
The court also struck from Instruction No. 6 offered by defendant, the word "intentionally". In this the court was correct because it makes no difference as far as the maintenance of a nuisance is concerned whether it was done intentionally, or was the result of negligence. 66 C.J.S., Nuisances, §§ 10 and 11; Roth v. City of St. Joseph, 164 Mo.App. 26, 147 S.W. 490; Schnitzer v. Excelsior Powder Mfg. Co., Mo.App., 160 S.W. 282; Boyle v. Neisner Bros., 230 Mo.App. 90, 87 S.W.2d 227; Bollinger v. Mungle, Mo. App., 175 S.W.2d 912.
Defendant further contends that this action was barred by the statute of limitations. That might have been true if it had been a permanent nuisance. McCleery v. City of Marshall, Mo.App., 65 S.W.2d 1042; Stewart v. City of Springfield, 350 Mo. 234, 165 S.W.2d 626, and cases cited.
But the evidence shows that it was temporary in character and abatable and the statute of limitations does not apply. Kelly v. City of Cape Girardeau, 227 Mo. App. 730, 60 S.W.2d 84; Shelly v. Ozark Pipe Line Corp., 327 Mo. 238, 37 S.W.2d 518, 75 A.L.R. 1316.
We recognize the rule laid down in Stewart v. City of Springfield, supra, and cases cited, but the facts in this case do *109 not bring it within that rule exempting "sewer systems". An abatement would not require the disruption of the whole sewer system. The discomfort of which plaintiffs complain, arising from filth, noxious odors and flooding, are not hallowed by prescription.
Appellant assigns as error the refusal of the court to give its offered instructions 11 to 18, inclusive. No authorities are cited to sustain this assertion either under "Points and Authorities" or in the argument. We have carefully read those refused instructions and have come to the conclusion that there was no error in their refusal. The three instructions given at the request of plaintiffs and the seven instructions given at the request of defendant fairly covered the issues, when read together.
The judgment of the trial court should be affirmed. It is so ordered.
BLAIR and McDOWELL, JJ., concur.